Travis W. Misfeldt, OSB #072082
Email: travis@speerhoyt.com
SPEER HOYT LLC
975 Oak Street, Suite 700
Eugene, Oregon 97401
Telephone: 541-485-5151
Facsimile: 541-485-5168

Attorneys for Plaintiff Ralph Rhodes

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(EUGENE DIVISION)

| | |
|---|---|
| RALPH RHODES<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for Long Beach Mortgage Loan Trust 2005-2.<br><br>　　　　　　　Defendant. | Case No. 6-12-cv-01357-AA<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**OVERVIEW**

This case presents a perfect example of why careful Court review of nonjudicial foreclosures remains critical, notwithstanding emerging clarity in the law around them.

Nonjudicial foreclosure allows banks to self-assess their own authority to foreclose on Oregon homeowners. Any system that depends on self-assessment necessarily depends on actors that are candid with themselves about their successes

**PAGE** 1 **– PLAINTIFF'S RESPONSE …**

and failures within the system. When self-directed candor is replaced by a bullying and self-protecting insistence that no mistakes were made, despite overwhelming and undisputed facts and circumstances both before and after the alleged foreclosure, the grossly inefficient result is disputes like this one that last for five years through several independent proceedings, all over property with, if the trustee's sale was conducted properly as the Bank alleges it was, a fair market value of $72,819.00[1].

Defendant ("Bank"), having directed Northwest Trustee Services, Inc. ("NTS") to foreclose on Lane County real property ("Rhodes Home") owned by Plaintiff ("Rhodes"), impliedly claims it holds an original note ("Note") given by Rhodes to Long Beach Mortgage Company ("LBMC") in 2005. Because Rhodes did not make the Note in the Bank's favor, the Bank can be the person entitled to enforce the Note under Oregon law only if the Note was properly negotiated to the Bank and the Bank had physical possession of the Note when the Bank told NTS to take the Rhodes Home.

Nearly three years after the alleged trustee's sale occurred, the Bank still cannot establish these basic commercial facts through competent testimony if the showing it makes to this Court in support of its Motion for Summary Judgment is any indication.

What's more, nothing in the hodgepodge of hastily assembled materials filed by the Bank's current attorney with its Motion meets the substance of Plaintiff's core factual claims in this case, which stand on this record as matters of undisputed material fact.

Summarized in one sentence, the Bank's argument is "if a Trustee's Deed gets recorded, however that occurs and whether or not the Bank can prove it should have

---

[1] See, e.g., Cornelison v. Kornbluth, 542 P.2d 981, 993 (Cal. 1975) (citing Smith v. Allen, 436 P.2d 65 (Cal. 1968) for the proposition that "a nonjudicial foreclosure sale, if regularly held, finally fixes the value of the property therein sold.").

PAGE 2 – PLAINTIFF'S RESPONSE …

been recorded, this Court is powerless to help a Plaintiff, no matter how little the Bank can prove through competent testimony when challenged on its assertions or how bad the facts might be against the Bank, both before and after that Deed gets recorded."

This Court has much more power than the Bank gives it credit for.  This Court must allow this matter to proceed to trial on the showing made by the Bank here.

**FACTS**

The Declaration of Irene Rhodes ("Rhodes Declaration") is incorporated here by this reference as though set forth fully.  The facts set forth in the Rhodes Declaration are unopposed by competent evidence in this summary judgment record for the reasons set forth below in the Section of this brief entitled "Argument on Motion to Strike."

The Rhodes Declaration is lengthy because the Rhodes family has been dealing with this situation diligently for nearly five years.  Given the Bank's emphasis on the trustee's sale that allegedly occurred on August 11, 2010, despite being noticed, to the extent it was, for an earlier date, it is important to note, in particular, the following undisputed facts around the various claims made by the Bank in its Motion:

1) Rhodes had permission to make the one modification plan payment that was made late when it was made and made a fourth plan payment in May, 2010, with the express permission of a manager for the alleged servicer[2] here, JPMorgan Chase

---

[2] Rhodes characterizes Chase as the "alleged servicer" here because the Bank has offered no proof of whatever relationship might have existed between Chase and the Bank when the events described in the Rhodes Declaration were occurring.  As set forth in the Rhodes Declaration, Chase, through dozens of contacts over nearly two years, never mentioned the Bank or the Bank's alleged interest in the Note until after the alleged trustee's sale and never gave any indication that anyone other than Chase was dictating what happened with Rhodes' situation.  Although Rhodes expects the Bank to claim an agency existing between the Bank, as principal, and Chase, as agent, it is difficult to see how such an agency could exist under Oregon law, regardless of what the parties may have agreed between themselves, when the alleged agent ("Chase") had more control over the negotiations than the putative principal.  See Brandup v. ReconTrust, 353 Or. 668, 705 (2013) (discussed further below).

PAGE 3 – PLAINTIFF'S RESPONSE …

Bank, N.A. ("Chase"). To the extent their modification plan was "broken" by the late payment that was authorized by Chase, Chase agreed, through Chase manager Tim Ivy, to reinstate Rhodes' "broken" plan if the fourth payment was timely made. The fourth payment was timely made by Rhodes as agreed, but Chase broke its agreement.

    2)    Rhodes was told by Chase in July, 2010, that no trustee's sale was scheduled, which communication effectively deprived him of a late chance to cure whatever default may have existed before the alleged trustee's sale occurred.

    3)    More than a year after the alleged trustee's sale, Rhodes agreed to a voluntary dismissal of the Bank's ejectment suit, relying to his detriment, as matters have played out, on the representation of the Bank's prior attorney, Holger Uhl, that Chase would sell Rhodes the Bank's interest in the Rhodes Home for the Rhodes Home's fair market value, once that value was established to Chase's satisfaction.

    4)    In furtherance of the deal that was made through Mr. Uhl, Chase promptly sent its appraiser, Justin Thayer, to the Rhodes Home. Mr. Thayer produced an appraisal that showed a price Rhodes was willing to pay for the Bank's interest.

    5)    After inducing Rhodes to agree to a dismissal of the ejectment suit when Rhodes was prepared to defend it, Chase refused to negotiate on the sale, except to indicate through the attorney it currently shares with the Bank, Mr. Hamlin, it would take about 250% of the Rhodes Home's fair market value for whatever interest the Bank has.

    If Rhodes' Request for Judicial Notice is granted, Exhibits A, B, and C to the Declaration of Travis W. Misfeldt in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("Misfeldt Declaration") should be considered by this Court in acting on the Motion for Summary Judgment filed by the Bank ("Motion").

**PAGE** 4 **– PLAINTIFF'S RESPONSE …**

Exhibits A and B, when read together, demonstrate that Chase, the alleged servicer here, settled claims made by the Department of Treasury's Office of the Comptroller of Currency ("OCC") around "certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in (Chase's) initiation and handling of foreclosure proceedings" between January 1, 2009, and December 31, 2010, by agreeing earlier this year to pay $753,250,131.00 into a settlement fund for persons affected by Chase's conduct as servicer during the period at issue in this case.

Exhibit C is a copy of an Assignment of Real Estate Mortgage recorded in Pottawattamie County, Iowa. This document shows the notarized signature of Jess Almanza in November, 2004. Mr. Almanza's is one of LBMC Vice Presidents whose signature allegedly appears on the back of the document that has been produced by the Bank as a copy of, purportedly, the Note. See Misfeldt Declaration, Exhibit D.

Although the Bank's claim to be the beneficiary of the Trust Deed Rhodes gave in the same transaction necessarily depends on proper negotiation of the Note, the Bank has made no effort to prove any part of that negotiation, choosing instead to rely on Mr. Hamlin's bare and inadmissible assertion[3] that the Note "is endorsed in blank on behalf of ("LBMC")." Declaration of Bruce C. Hamlin in Support of (the Bank's) Motion for Summary Judgment ("Hamlin Declaration"), Paragraph 2, third sentence.

Comparison of the clear and notarized signature on Exhibit C and the nearly illegible and completely different mark on the purported copy of the Note produced by the Bank in support of its Motion suggests Mr. Almanza did not sign the Note. As

---

[3] Although referenced here, Mr. Hamlin's attempted testimony on this topic is one of the subjects of Rhodes' Motion to Strike, which is argued below. Rhodes does not intend to waive his Motion as to this statement by mentioning it here.

PAGE 5 – PLAINTIFF'S RESPONSE …

argued more fully below, if Mr. Almanza did not indorse the Note as the Bank claims he did, the Bank is not the ORS 73.0301 "person entitled to enforce" ("PETE")[4] of the Note and may not have had a right to direct any foreclosure that may have occurred here.

Exhibits E, F and G to the Declaration of Travis W. Misfeldt in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("Misfeldt Declaration") show, among other things, that, by reference to the production made by Northwest Trustee Services, Inc. ("NTS") to Rhodes, neither the Bank nor Chase had any explicit role in the bidding NTS was instructed to make at the Trustee's Sale that allegedly occurred. NTS's non-response to Exhibit G raises an inference that NTS did not postpone by public proclamation any sale that was actually conducted here.

Last, Rhodes notes that NTS is not the Trustee identified in the Deed of Trust he signed in 2005. In its Motion, the Bank makes no attempt to prove it recorded any appointment of a successor trustee as required by Oregon's Trust Deed Act ("Act").

**STANDARDS**

"A summary judgment is neither a method of avoiding the necessity for proving one's case nor a clever procedural gambit whereby a claimant can shift to his adversary his burden of proof on one or more issues." United States v. Dibble, 429 F.2d 598, 601

---

[4] Rhodes adopts this nomenclature from the Oregon Supreme Court's recent decision in Niday v. GMAC Mortgage, LLC, 353 Or. 648, 665 n. 8 (2013). Niday and its companion case, Brandrup v. ReconTrust Co., 353 Or. 668 (2013), were decided about a week before the Bank filed its Motion and resolve many of the issues argued by the Bank through citation primarily to unpublished U.S. District Court cases. As the Brandup Court correctly observed, 353 Or. At 673, interpretation of Oregon's statutory law, including the Act and Oregon's Uniform Commercial Code ("UCC") provisions about negotiable instruments are matters for the Oregon Supreme Court. Accordingly, Rhodes focuses on the decisions of that Court in his analysis below instead of asking the Court to consider arguments based on trial court decisions in the U.S. District Court for Oregon issued before Niday and Brandup, except to note that the present case is factually indistinguishable from Hinshaw v. BAC Home Loans Servicing LP, and Judge Jones' able Opinion and Order denying Summary Judgment there might be helpful here.

**PAGE** 6 **– PLAINTIFF'S RESPONSE …**

(9th Cir. 1970). When a party's moving papers do not comply with the requirements of Rule 56, it is error to grant a movant summary judgment on their basis. Id, at 601-02.

Rule 56(e) requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that affiant is competent to testify to the matters stated therein."

The Bank's initial burden on its Motion is showing the absence of a genuine issue as to any material fact. Adickes v. Kress Company, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The substantive law governing a claim determines if a fact is material. Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party, and inferences from facts are viewed most favorably to the non-moving party. T.W. Elec. Service v. Pac. Elec. Contractors, 809 F.2d 626, 630-31 (9th Cir. 1987).

Rhodes moves below to strike portions of the Hamlin Declaration and all Exhibits to that Declaration. If Rhodes' Motion to Strike is granted as it should be, the Bank's Motion cannot be granted because the Bank's record here will be completely bare as to all factual issues. Regardless of what the Court does on Rhodes' Motion to Strike, however, material factual issues remain in this case preventing Summary Judgment.

**ARGUMENT**

**Motion to Strike Portions of and Exhibits to Hamlin Declaration**

Rhodes moves to strike (1) the third sentence of the second paragraph of the Hamlin Declaration (reading "(The Note) is endorsed in blank on behalf of (LBMC)"); and (2) all of the Exhibits to that Declaration under the Dibble case cited above.

Mr. Hamlin is the Bank's attorney. Through his Declaration, he attempts to enter into the record on the Bank's Motion opinion evidence without any foundational facts and a number of unauthenticated documents that contain inadmissible hearsay.

Mr. Hamlin's bare assertion that "the Note is endorsed in blank on behalf of LBMC" is a legal conclusion, not a fact. Further, the attempted testimony cannot be accepted into evidence without foundational facts on personal knowledge establishing how Mr. Hamlin reached that conclusion. The Hamlin Declaration offers no such facts.

The specified testimony must be struck without appropriate foundational facts.

All of the Exhibits to the Hamlin Declaration contain inadmissible hearsay, and none of the Exhibits to the Hamlin Declaration are admissible to support the Bank's Motion without authentication. As the Hamlin Declaration indicates, he got all the documents he attempts to offer from other sources. Further, all such documents came from sources on the Bank's side of this dispute; presumably testimony from authorized agents of the Bank, Chase, and NTS were available to the Bank's attorney if he had wished to offer his Exhibits through witnesses competent to authenticate them.

Exhibits that are not properly authenticated cannot support a successful Summary Judgment Motion under Dibble:

> A writing is not authenticated simply by attaching it to an affidavit, even if the writing appears on its face to have originated from some governmental agency and the affiant is a government official. The foundation is laid for receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery....
>
> (The witness') affidavit did not lay the foundation for the receipt of the exhibits on any theory. His affidavit consists of a series of legal conclusions unsupported by facts. He says, for example, that the master license with the County "was duly executed" by the County and the Army on June 12, 1959, and a "true copy" is

**PAGE** 8 **– PLAINTIFF'S RESPONSE ...**

attached. He did not sign the exhibit, and he states no facts at all from which we could conclude that he could identify the signatures of those who did; he tells us nothing to show how he knows the document to be a correct copy of a genuine contract. The fact that the affiant is employed by the (party for whom the exhibit is offered) and that the document was supposedly signed by somebody who is also (related to that party) is patently insufficient to provide him with the necessary personal knowledge to authenticate it.

Dibble, 429 F.2d at 602.

The Hamlin Declaration is the Bank's sole attempt to meet its initial burden on its Motion. The Bank has not met its initial burden, and its Motion must be denied[5].

**Argument on Request for Judicial Notice**

A Court may judicially notice facts under FRE 201 when those facts are not subject to reasonable dispute because they are: (1) generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Undisputed matters of public record may be judicially noticed, Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001), including documents on file in tribunals. See Bennett v. Medtronic, Inc., 285 F.3d 801, 803 n. 2 (9th Cir. 2002). A district court's decision to take judicial notice is reviewed for abuse of discretion. Ritter v. Hughes Aircraft Co., 58 F.3d 454, 458 (9th Cir. 1995).

This Court should judicially notice Exhibits A and B to the Misfeldt Declaration because they put the facts offered through the Rhodes Declaration in their proper context. The Bank's understated Motion suggests what happened to the Rhodes was merely another day at the office for the well-oiled loan servicing machine that was its

---

[5] It is somewhat surprising that the Bank would make such an indifferent effort to support its Motion for Summary Judgement correctly because it has had decisions to grant such Motions on inadequate showings reversed for its failure to provide competent testimony on critical parts of its claims, including the exact claim it makes here, i.e., its claim to hold the beneficial interest in the Note. See, e.g., Herrera v. Deutsche Bank National Trust Company, 127 Cal.Rptr.3d 364 (Ct.App. 2011).

PAGE 9 – PLAINTIFF'S RESPONSE …

alleged servicer, Chase. In fact, however, Chase has tacitly acknowledged to Treasury through the Consent Orders attached to the Misfeldt Declaration as Exhibits A and B that it made a lot of mistakes affecting a lot of people during 2009 and 2010.

Exhibit C to the Misfeldt Declaration should be judicially noticed because it is the only verified signature of LBMC Vice President Jess Almanza in this record.

As explained more fully below, the Bank's case depends on its claim that it was the holder of the Note when NTS initiated its nonjudicial foreclosure process in early 2010. Under Oregon law, the Bank is not the beneficiary of the Deed of Trust allegedly foreclosed by NTS unless it is the person to whom the Note obligation is owed.

By reference to the bare and inadmissible assertion made in the Hamlin Declaration about the Note, the Bank appears to claim the Note is indorsed in blank.

To be the Note's PETE after a blank indorsement, the Bank must prove: (1) proper indorsement of the Note by LBMC; and (2) physical possession of the Note.

The Bank has not proven possession of the Note; the Hamlin Declaration, in fact, indicates the Bank's attorney got his copy of the Note from Chase, not the Bank.

Regardless of which bank has physical possession of the Note, however, neither the Bank nor Chase is the Note's PETE unless Mr. Almanza's signature on the back of the original Note is actually his signature. If the original Note, wherever it is, does not show Mr. Almanza's signature, the Note was not properly indorsed, and Rhodes has the defense of a forged indorsement against anyone making presentment of the Note.

Comparison of Exhibits C and D to the Misfeldt Declaration raise issues of material fact around the authenticity of Mr. Almanza's signature on the back of the Note, wherever the Note itself might be. Exhibit C should be judicially noticed for that reason.

**Argument on Rhodes' Demand for Presentment**

Following the trustee's sale that allegedly occurred in August, 2010, Rhodes cannot be sued for a deficiency on the Note.  ORS 86.770(2).  Effectively, then, the Note is no longer enforceable against Rhodes under Oregon law because the Bank elected its remedy under the Note by directing NTS to conduct its sale and take the Rhodes Home.

Rhodes demands presentment of the Note under ORS 73.0501(2)(b) on the factual issue of whether the Bank was, in fact, the Note's PETE[6] when it directed NTS to initiate foreclosure proceedings against Rhodes.  The power to foreclose the beneficial interest in a trust deed follows the beneficial interest, Brandup, 353 Or. at 675, and a "beneficiary" under the Act is the person to whom the obligation that the trust deed secures is owed.  Id., at 674.  Thus, in order to prove its entitlement to direct foreclosure of the Note, the Bank must prove it was the person Rhodes owed on the Note[7].

Rhodes did not make the Note in the Bank's favor, so the Bank must show that it is the Note's PETE in order to establish it was the person Rhodes owed on the Note.

The Bank's sole attempt to make a factual showing in support of its Motion, i.e.,

---

[6] While Niday indicates continuing uncertainty as to whether it is the Note's owner or the Note's PETE that is the Trust Deed's beneficiary when they are different, the Niday Court does indicate correctly that it is likely that status as a note's PETE confers the right to foreclose when the PETE and the note's owner are different.  See Niday, 353 Or. at 665 n. 8 (citing Edelstein v. NY Mellon, 286 P. 249, 257 (Nev. 2012).

[7] Rhodes notes in passing that he is not claiming, as some similarly situated plaintiffs have, the Bank must have showed him the Note before directing its trustee to start a nonjudicial foreclosure.  Certainly, a careful trustee might have made that demand to avoid a later claim that it clouded a plaintiff's title on behalf of someone who was not entitled to have directed a foreclosure.  Oregon law is now clear, however, that a party cannot use the Act unless it is the person owed on the underlying Note, so it is perfectly appropriate that a party having used the Act to claim an interest in real property without judicial assistance be compelled to prove its status as a beneficiary under the Act when a foreclosure allegedly completed under the Act becomes subject to judicial review in a case such as this one.

PAGE 11 – PLAINTIFF'S RESPONSE …

the Hamlin Declaration, contains no competent proof of proper indorsement or delivery of the Note from LBMC to the Bank.  Indeed, to the extent Mr. Hamlin's testimony tells us anything about the Note, it suggests the Note is in Chase's possession.  See Hamlin Declaration, Paragraph 2 (indicating Mr. Hamlin got his copy of the Note from Chase).

Because the Bank has declined to prove any relationship that might exist between Chase and the Bank, the Bank's factual showing indicates that, if all other facts suggested by the Bank around indorsed and delivery are treated as true though none of them are proven, Chase, and not the Bank, is the person Rhodes owed on the Note.

**The Bank's Motion must Show Strict Compliance with the Act.**

A trustee's power of sale is subject to strict statutory rules designed to protect the grantor of the trust deed being foreclosed.  The Court in Staffordshire v. Cal-Western Reconveyance, 149 P.3d 150, 209 Or. App. 528 (Or. App., 2006), Petition for Review denied, 160 P.3d 992, 342 Or. 727 (Or. 2007), first enunciated this principle as follows:

> The Act represents a well-coordinated statutory scheme to protect grantors from the unauthorized foreclosure and wrongful sale of property, while at the same time providing creditors with a quick and efficient remedy against a defaulting grantor. As discussed above, it confers upon a trustee the power to sell property securing an obligation under a trust deed in the event of default, without the necessity for judicial action. However, the trustee's power of sale is subject to strict statutory rules designed to protect the grantor, including provisions relating to notice and reinstatement.

Where, as here, a party claims title to real property following a trustee's sale, that party must prove the alleged trustee's sale conformed with all provisions of the Act.  See Option One Mortgage Corp. v. Wall, 159 Or.App. 354 (1999).  Where that party moves for summary judgment on its claims, a failure to show strict compliance with any requirement of the Act is fatal to its Motion.  Niday, 353 Or. at  666-67 (2013).

PAGE 12 – PLAINTIFF'S RESPONSE …

As argued elsewhere in this Memorandum, the Bank fails to prove through admissible evidence that it was the Note's "beneficiary" under the Act when NTS started its nonjudicial foreclosure proceeding. In Oregon, a trust deed's beneficiary for purposes of ORS 86.705 is determined by its "functional role, not ("its") designation." Brandup, 353 Or. at 685. Because trustees may foreclose judicially only for Act beneficiaries, beneficiaries seeking to use the Act must prove their status by proving their entitlement to receive the payments required by the underlying Note.

The Bank's failure to prove its entitlement to those payments is fatal to Motion.

The Bank's Motion papers also fail to prove compliance with at least two of the Act's technical requirements. First, the Bank does not show NTS's appointment as successor trustee, if any, was recorded as required by ORS 86.735(1). Also, there is no proof in this record that any postponement of the alleged trustee's sale from August 4 to August 11, 2010, was accomplished by "public proclamation." ORS 86.755(2).

**Any Failure of Tender was Excused under Oregon Law**

The Bank attempts to gloss Chase's years of incompetence in this matter by alleging that Rhodes' failure to tender whatever Chase alleged he owed on any given day constitutes a complete defense to his claims for equitable treatment and relief.

Equity under Oregon law is "generally a two-way street," and parties facing uncertainty about what they might owe and to whom "should be encouraged to obtain a judicial resolution." Kerr v. Miller, 159 Or.App. 613, 635 (1999). Accordingly, making an adequate tender is excused where the amount owed is uncertain or in dispute. Id.

In any event, the Rhodes Declaration establishes as undisputed fact on this

PAGE 13 – PLAINTIFF'S RESPONSE …

record that Rhodes: (1) made repeated attempts to make things right with Chase, on the apparently erroneous belief induced by Chase that Chase controlled the Note, before the alleged trustee's sale; and (2) held up his end of the bargain his attorney made with the attorney representing Chase and the Bank after the sale, when that attorney wanted to avoid a trial of the Bank's ejectment action, only to have Chase quit honoring the deal after taking the first steps[8] it had agreed to take in securing the voluntary dismissal.

**CONCLUSION**

The Bank's Motion cannot be granted without effectively letting the Bank substitute assertions for facts and proof relating to very basic business principles.

As the Third Circuit has noted in this context, "(f)inancial institutions, noted for insisting on their customers' compliance with numerous ritualistic formalities, are not sympathetic petitioners in urging relaxation of elementary business practice." Adams v. Madison Realty & Development, Inc., 853 F.2d 163, 169 (3rd Cir. 1998).

Certainly, the Bank would not take a copy of a check from Rhodes for payment on the Note, but the Bank wants this Court to find producing a poor and unauthenticated copy of the Note from the files of some other bank is enough to establish the Bank as the person entitled to receive payments on the Note for purposes of Oregon law.

---

[8] The Bank's current attorney seeks to avoid the deal made by his predecessor on the file by pointing solely to part of the language discussing the settlement deal in the Stipulation to Dismiss filed by these parties in Lane County Circuit Court Cause No. 1210-22802. Counsel's disingenuous argument ignores the rest of the language in the Stipulation, which specifically discusses a period of not less than sixty days "to negotiate and finalize such a resolution" as well as Chase's objective conduct in sending its appraiser to the Rhodes Home to produce an appraisal for the parties to discuss.

The Motion cannot be granted as made and should not be granted anyways.

DATED: July 8, 2013

        SPEER HOYT LLC

      By: <u>s/Travis W. Misfeldt</u>
        Travis W. Misfeldt, OSB #072082
        Email:  travis@speerhoyt.com
        975 Oak Street, Suite 700
        Eugene, OR 97401
        Telephone:  (541) 485-5151
        Fax:  (541) 485-5168

        Of Attorneys for Plaintiff Ralph Rhodes